Robin L. Cohen (rcohen@cohenziffer.com)
Alexander M. Sugzda (asugzda@cohenziffer.com)
COHEN ZIFFER FRENCHMAN & MCKENNA LLP
1325 Avenue of the Americas
New York, New York 10019

*Attorneys for Plaintiff The Vale Fox Distillery LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE VALE FOX DISTILLERY LLC, <br><br> Plaintiff, <br><br> v. <br><br> CENTRAL MUTUAL INSURANCE COMPANY, <br><br> Defendant. | Civil Action No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff The Vale Fox Distillery LLC ("Vale Fox"), by and through its undersigned counsel, as and for its Complaint against Defendant Central Mutual Insurance Company ("Central Mutual"), alleges as follows:

### PRELIMINARY STATEMENT

1.      This diversity action for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing arises out of Central Mutual's refusal to provide coverage for Vale Fox's claim under Industrial Processing Policy No. CLP 9926665 15, issued for the policy period running from October 3, 2023 to October 3, 2024 (the "Policy," attached hereto as Exhibit A).

2.      Nestled in the heart of the Hudson Valley, Vale Fox is a start-up distillery that sells gin and, after distilling and aging whisky for at least three years, American single malt whisky.

3.      Vale Fox had just completed its first season of sales of its single malt whisky when, in December 2023, barrel racks collapsed in its distilling room, causing dozens of barrels of aging whisky (all of which had aged for at least three years) to fall to the floor and burst open. Vale Fox salvaged what it could, but it lost more than 50 barrels of aging whisky valued at more than $2.5 million (the "Loss").

4.      This was a devastating loss for a small business such as Vale Fox and has forced the company to take extraordinary steps to continue to finance the business and preserve the momentum of its very successful first season of sales without a significant portion of the whisky it had aged for sale in 2024.

5.      Fortunately, Vale Fox had purchased the Policy to protect itself against "direct physical loss of or damage to" its personal property and buildings, including specific coverage for the collapse of personal property.

6.      Vale Fox reported the Loss to Central Mutual on the day it was discovered and fully cooperated in Central Mutual's months-long investigation of the Loss, providing documents and photos, assisting with multiple site visits by engineers retained by Central Mutual, and participating in an examination under oath concerning the Loss and its business.

7.      Unfortunately, Central Mutual denied Vale Fox's claim. In a perfunctory letter with no analysis or reference to the details of its investigation, Central Mutual stated in a conclusory fashion that it believed that several exclusions applied and that the specific coverage for collapse of personal property did not apply, despite the fact that its own engineer's report checks every box required for the collapse coverage to apply.

8.      When the Loss occurred, Vale Fox reasonably expected coverage to be provided under its Policy and to be able to work with Central Mutual to recover from this significant blow.

Instead, Central Mutual conducted a claim investigation that appeared designed to delay the claim and seek ways to deny the claim, and even though its investigation did not reveal the facts necessary to deny the claim, it denied it anyway based on positions that no reasonable insurer would be expected to take. The denial of the claim has caused Vale Fox to incur costs it would otherwise not have to incur. This is quintessential bad faith separate and apart from the breach of the contract itself.

9.      Vale Fox thus asks this Court to (i) find Central Mutual liable for breaching the Policy it sold to Vale Fox by denying Vale Fox's claim; (ii) declare that Vale Fox is entitled to coverage under the Policy for the Loss; and (iii) find Central Mutual liable for its breach of the implied covenant of good faith and fair dealing in the Policy and hold Central Mutual accountable for its dilatory and unreasonable claims-handling practices.

## PARTIES

10.      Vale Fox is a limited liability company formed under the laws of Delaware with its principal place of business in New York. The members of Vale Fox are Livens Aquam, LLC, John B. Harris 1998 Trust, ████████████, ████████████, ████████████, ████████ ████████, ████████████, ████████████, ████████████, ████████████, ████████, ████████████, ████████████, and ████████████.

11.      Livens Aquam, LLC, is a limited liability company formed under the laws of Delaware with its principal place of business in Connecticut. Livens Aquam, LLC, is the majority investor in Vale Fox and owns more than 80% of the company. The members of Livens Aquam, LLC, are Eral Gokgol-Kline, Arman Gokgol-Kline, Turkiz Gokgol-Kline, and David Kline.

      a.      Eral Gokgol-Kline is a citizen of Connecticut.

      b.      Arman Gokgol-Kline is a citizen of Connecticut.

      c.      Turkiz Gokgol-Kline is a citizen of Rhode Island.

       d.     David Kline is a citizen of Rhode Island.

12.     John Harris, a citizen of Illinois, is the trustee of the John B. Harris 1998 Trust.

13.     ██████████ is a citizen of Connecticut.

14.     ██████████ is a citizen of New York.

15.     ██████████ is a citizen of the United Kingdom.

16.     ██████████ is a citizen of New York.

17.     █████████ is a citizen of Connecticut.

18.     ██████████ is a citizen of Connecticut.

19.     ████████ is a citizen of New York.

20.     ██████████ is a citizen of New York.

21.     █████████ is a citizen of New York.

22.     ██████████ is a citizen of Connecticut.

23.     ████████ is a citizen of New York.

24.     █████████ is a citizen of New York.

25.     Upon information and belief, Central Mutual is a corporation formed under the laws of Ohio with its principal place of business in Ohio.

## JURISDICTION & VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this action and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**I.**   **Vale Fox's Business, Distilling Process, and Loss**

28.     Founded in 2015, Vale Fox operates a distillery located at 619 Noxon Rd., Poughkeepsie, New York 12603.

29.     Its first product was a gin launched on August 26, 2019. After receiving positive press coverage and awards recognition, Vale Fox began to focus on its next project—American single malt whisky.

30.     After Vale Fox distills its whisky, it places it in barrels to age.

31.     The barrels are stored on metal racks in different locations of Vale Fox's property, including being stored in the distilling room itself.

32.     Before using a rack, Vale Fox thoroughly inspects it, looking for any deformities (e.g., rust, cracks, holes, bent metal).

33.     Every time Vale Fox moves one of its racks to a new location, it inspects the rack again.

34.     If Vale Fox observes any deformities at any time, Vale Fox does not use the rack.

35.     Each rack is designed to hold two barrels, and the racks are designed to stack on top of one another up to six racks high. In order to operate well within the manufacturer's specifications, Vale Fox only stacks its racks up to five racks high.

36.     Vale Fox ages its single malt whisky between three and four years.

37.     In 2023, Vale Fox released Curium—its first single malt whisky—under its brand name, Vale Fox American Single Malt Whisky. A 750-milliliter bottle of Curium typically sold for $149.99.

38.     The demand for Curium was so high that Vale Fox was able to sell the vast majority of it directly to consumers through its tasting room, rather than through wholesale channels.

39.     While Curium was selling briskly and generating positive reviews, Vale Fox was aging additional whisky. On December 18, 2023, Vale Fox had dozens of barrels that had been aging for at least three years, and was soon to be bottled and then sold, stored on racks in its distilling room.

40.     On December 19, 2023, Vale Fox's manager arrived at the distillery to find that the racks had collapsed, causing 60 barrels to fall on top of one another and then onto the floor. This resulted in 52 of the barrels breaking and the aging single malt whisky subsequently leaking out.

41.     In addition, the collapse resulted in damage to an interior wall of one of Vale Fox's storage rooms.

42.     These were some of Vale Fox's oldest barrels of single malt whisky: the lost single malt whisky varied in age from 3.1 years to 3.9 years, with a median age of 3.65 years.

43.     Based on the price at which Vale Fox sold most bottles of Curium ($149.99), the lost single malt whisky, if bottled and sold, would have been worth more than $2.5 million.

44.     The 52 barrels lost represent a vast majority of the barrels Vale Fox was ready to bottle and sell in 2024. Rather than purchase whisky already aged at another location to bottle and sell under the Vale Fox American Single Malt Whisky brand, Vale Fox exclusively sells the single malt whisky it distills and ages on site.

45.     Thus, without finished single malt whisky to bottle, Vale Fox's marketing plans to build on the sales momentum generated by the release of Curium through additional releases under the Vale Fox American Single Malt Whisky brand have been severely undermined.

46.     Vale Fox's customers, who range from bars, restaurants, and liquor stores to individual buyers, expect reliable supplies of Vale Fox's products to be available. An interruption to the supply, no matter how justifiable, damages Vale Fox's reputation in the industry.

## II.     <u>The Policy</u>

47.     The Policy provides a $5,652,000 limit in coverage for "Personal Property of Insured Including 'Stock,'" a $1,419,000 limit in coverage for "Building," and a $5,000 per occurrence deductible for the property located at 619 Noxon Rd., Poughkeepsie, NY 12603.

48.     The Policy's insuring agreement in the "Building and Personal Property Coverage Form" states that Central Mutual "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."

49.     "Covered Property" includes, in relevant part, the following:

a. Building, meaning the building or structure described in the Declarations . . . .
b. Your Business Personal Property consists of the following property located in or on the building or structure described in the Declarations . . . :
    (1) Furniture and fixtures;
    (2) Machinery and equipment;
    (3) "Stock";
    (4) All other personal property owned by you and used in your business
    . . . .

50.     "Stock" is defined as "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping."

51.     Under the Policy's "Cause of Loss – Special Form," "Covered Cause of Loss" includes "Additional Coverage, Collapse":

D. Additional Coverage – Collapse
The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in D.1. through D.7.
1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the

result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

    a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

    c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

    d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

        (1) A cause of loss listed in 2.a. or 2.b.;

        (2) One or more of the "specified causes of loss";

        (3) Breakage of building glass;

        (4) Weight of people or personal property; or

        (5) Weight of rain that collects on a roof.

3. This Additional Coverage – Collapse does not apply to:

    a. A building or any part of a building that is in danger of falling down or caving in;

    b. A part of a building that is standing, even if it has separated from another part of the building; or

    c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

    a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

    b. Awnings, gutters and downspouts;

    c. Yard fixtures;

    d. Outdoor swimming pools;

    e. Fences;

    f. Piers, wharves and docks;

    g. Beach or diving platforms or appurtenances;

    h. Retaining walls; and

    i. Walks, roadways and other paved surfaces;

    if an abrupt collapse is caused by a cause of loss listed in 2.a. through 2.d., we will pay for loss or damage to that property only if:

        (1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

        (2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is not the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

    a. The collapse of personal property was caused by a cause of loss listed in 2.a. through 2.d.;

    b. The personal property which collapses is inside a building; and

    c. The property which collapses is not of a kind listed in 4., regardless of whether that kind of property is considered to be personal property or real property.

    The coverage stated in this Paragraph 5. does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

52.    The Policy's "Cause of Loss – Special Form includes several exclusions raised by

Central Mutual, none of which apply:

2. We will not pay for loss or damage caused by or resulting from any of the following:

. . . .

    d.    (1) Wear and tear;

        (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

        . . .

        (4) Settling, cracking, shrinking or expansion;

        . . . .

        But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

    . . . .

    k. Collapse, including any of the following conditions of property or any part of the property:

        (1) An abrupt falling down or caving in;

        (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

        (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or
(b) To collapse caused by one or more of the following:
    (i) The "specified causes of loss";
    (ii) Breakage of building glass;
    (iii) Weight of rain that collects on a roof; or
    (iv) Weight of people or personal property.
. . . .
m. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
. . . .
c. Faulty, inadequate or defective:
    (1) Planning, zoning, development, surveying, siting;
    (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
    (3) Materials used in repair, construction, renovation or remodeling; or
    (4) Maintenance;
of part or all of any property on or off the described premises.

53.    "Specified cause of loss" is defined as "fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." Within that definition, "[f]alling objects does not include loss or damage to . . . [p]ersonal property in the open; or . . . [t]he interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object."

54.    Under the Policy's Declarations and "Building and Personal Property Coverage Form," lost "Stock" is valued at Replacement Cost.

55. However, per the "Central Premier Plus® Property Extensions Coverage Endorsement - New York," the "Building and Personal Property Coverage Form" is amended by adding the following provision:

> f. Manufacturer's Selling Price (Finished "Stock" Only)
> We will determine the value of finished "stock" you manufacture, in the event of loss or damage, at:
> 1) The selling price, as if no loss or damage occurred;
> 2) Less discounts and expenses you otherwise would have had.

56. While neither the "Building and Personal Property Coverage Form" nor the "Central Premier Plus® Property Extensions Coverage Endorsement - New York," provide any definition for "finished 'stock,'" the Policy's "Business Income (and Extra Expense) Coverage Form" states that "'[f]inished stock' also includes whiskey and alcoholic products being aged . . . ."

## III. Vale Fox's Claim and Central Mutual's Incorrect Denial and Bad Faith Claims Handling

57. On December 19, 2023, the same day the Loss was discovered, Vale Fox notified Central Mutual of the Loss.

58. On that day and over the next two days, Vale Fox sent Central Mutual detailed updates on the Loss, including numerous photos of the Loss, the number of barrels lost, the volume of aging whisky lost, and the value of that whisky based on the applicable Policy provisions.

59. In the ensuing weeks, Central Mutual transferred the claim from one claims handler to another, and while Vale Fox sought to cooperate and accommodate any reasonable investigation by Central Mutual, Central Mutual's new claims adjuster was focused on having Vale Fox sign a "non-waiver agreement" making clear that Central Mutual's investigation did not constitute a waiver of its right to later deny coverage.

60.     Central Mutual also hired an engineer, J.S. Held Engineering Service ("J.S. Held"), to assess the cause of the Loss. J.S. Held first visited the distillery on January 4, 2023. At that visit, Vale Fox recommended that J.S. Held take samples of the damaged racks for analysis, but J.S. Held did not do so at that time.

61.     On February 2, 2024, J.S. Held issued its Whiskey Barrel Rack Failure Cause Analysis Report (the "February 2 Report," attached hereto as Exhibit B), concluding that the failure was caused by "age-related degradation." Specifically, J.S. Held wrote:

> The damage to the racking did not appear to be caused directly by corrosion, although surface rust was observed and the insured stated that the racking had been stored outside. Corrosion does appear, however, to have weakened the racks from their original state. No failed or poorly completed welds were observed. No signs of a manufacturing defect were identified. Inspection of the racking appeared to indicate that the racking failed due to fatigue on the connection between the cross bracing and the barrel supports.

62.     However, J.S. Held did explicitly note that its comments were "based upon a visual inspection" and it recommended "completing a microscopic examination of the metal components referred to above at a forensic metallurgical laboratory."

63.     On February 7, 2024, J.S. Held issued an addendum to the February 2 Report (the "February 7 Addendum," attached hereto as Exhibit C), clarifying that:

> The barrel racking did not fail as a direct result of the weight of the barrels. The racking was rated for up to six levels of barrels, with each barrel having a capacity of up to 70 gallons. The subject racking was only five levels high and the barrels were 55 to 60 gallon barrels. As such, the racks were under their rated capacity for new or undamaged racks. The weight of the barrels did figure into the applied loads that caused the racks to fail, but the failure was the result of metal failure within the racks and was not related to loading above the manufacturer's recommendations. Overall, the racks appear to have been utilized in accordance with the manufacturer's recommendations, but failed as a result of long-term, hidden damage to the metal cross frames.

64.     The February 7 Addendum again noted the option of performing metallurgical analysis.

65.     On February 9, 2024, Central Mutual forwarded copies of the February 2 Report and February 7 Addendum and requested that a representative of Vale Fox sit for an examination under oath ("EUO").

66.     On February 15, 2024, Vale Fox corrected an inaccurate statement in the February 2 Report and February 7 Addendum: J.S. Held had reported that certain racks had been stored outside, but Vale Fox noted (as it had told J.S. Held originally) that the racks that collapsed were never stored outside. The only racks that Vale Fox stores outside are those it does not use due to age or defect. Vale Fox requested that Central Mutual pass this correction on to J.S. Held and determine if this changed J.S. Held's analysis. Vale Fox never received any confirmation as to whether that information was provided to J.S. Held.

67.     On February 28, 2024, Central Mutual requested that J.S. Held perform another site visit to take samples of the damaged racks for metallurgical testing.

68.     On March 7, 2024, more than two months after the Loss, Central Mutual requested documentation and information from Vale Fox and said that the EUO would need to be delayed. When counsel for Vale Fox asked counsel for Central Mutual why the documents were being requested at this time and why the EUO would need to be delayed, counsel for Central Mutual responded that multiple people at Central Mutual and outside consultants were reviewing the claim file and that those people decided these additional documents were necessary. Counsel for Central Mutual declined to share who those people were or why the information was being requested at that point.

69.     On March 15, 2024, Vale Fox provided all information reasonably requested.

70.     On April 3, 2024, Central Mutual's counsel conducted the EUO of a representative of Vale Fox.

71.     Following the EUO, Central Mutual requested additional documents, which Vale Fox promptly provided.

72.     On April 12, 2024, Central Mutual sent Vale Fox a copy of an additional report by J.S. Held, dated April 8, 2024 (the "April 8 Report," attached hereto as Exhibit D), which had performed "visual, stereomicroscopic, and metallographic examinations" on five sample damaged racks.

73.     In the April 8 Report, J.S. Held determined that the racks failed due to improper welding and an inferior design. Specifically:

- Rack #1a/1b,[1] Rack #3, and Rack #4 all exhibited regions of incomplete fusion in the welds between the side supports and connecting bars.
- Rack #1a/1b, Rack #2, Rack #3, and Rack #4, with a single pair of connecting bars, were weaker than Rack #5, with two pairs of connecting bars.
- The incomplete fusion welding discontinuities in Rack #1a/1b, Rack #3, and Rack #4, combined with the weaker single connecting bar design, caused the racks to crack and fracture after a load was applied. It is likely that one of these racks failed first, followed by the barrels falling and applying additional loads to the remaining racks.
- The deformation observed in Rack #2 and Rack #5 is consistent with loading applied during the event when the stack of whiskey barrels fell.

74.     Additionally, in the April 8 Report, J.S. Held explained that "[i]ncomplete fusion is a welding discontinuity in which fusion does not occur between weld metal and base metal fusion faces and typically results from improper or inadequate manipulation of the welding torch by the welder during fabrication," that "structural welding codes require complete fusion between weld metal and base metal fusion faces," and that "[t]he incomplete fusion regions in the rack welds are considered defective because of their size and because they create stress concentrations and weaknesses in the welded connections."

---

[1] Rack #1 had been fractured into two separate pieces.

75.     The April 8 Report, which was based on more than mere visual observation, overrules—or, at the very least, directly contradicts—the findings in the February 2 Report and February 7 Addendum, which ruled out welding errors and attributed the failure to age-related deterioration.

76.     On May 9, 2024—over one month after the EUO and Central Mutual's receipt of the April 8 Report and almost five months after the loss—Central Mutual sent a letter denying coverage (the "Denial Letter," attached hereto as Exhibit E) and an accompanying estimate of damage to the building (the "Building Estimate," attached hereto as Exhibit F).[2]

77.     The Denial Letter contains more than nine pages of copied and pasted policy provisions before providing several reasons why there is purportedly no coverage for the Loss. But the Denial Letter provides no analysis. It merely restates a given provision and then states "[b]ased on the investigation, it appears" that a given exclusion is implicated or that the Additional Coverage for Collapse is not implicated.

78.     These conclusory "analysis" paragraphs of the Denial Letter contain no reference whatsoever to the various J.S. Held reports, any documents provided by Vale Fox, or the EUO, so it is impossible to tell what part of Central Mutual's "investigation" it believes justifies these conclusions.

79.     And these conclusions cannot be justified, because the Additional Coverage for Collapse is implicated and none of the cited exclusions apply.

80.     As just one example of how the Additional Coverage for Collapse is implicated, it covers "damage to Covered Property" if "personal property abruptly falls down or caves in."

---

[2] Central Mutual also determined that the estimated cost to repair the damaged wall was $3,653.20, which does not exceed the $5,000.00 per occurrence deductible.

Central Mutual has never taken the position that the lost racks, barrels, and whisky are not Covered Property or that the racks and barrels did not abruptly fall down or cave in.

81. The collapse of personal property can be caused by "[u]se of defective materials or methods in construction" if the collapse is caused in part by "weight of . . . personal property." The April 8 Report finds that defective materials or methods were used in the welding of the racks, and that ultimately the weight of the barrels and whisky stored in the racks caused the collapse.

82. The Additional Coverage for Collapse for personal property only further requires that the personal property that collapses be inside a building (which cannot be disputed, as the racks were inside Vale Fox's distillery), is not one of several specific types of property, *see* Paragraph 51, *supra* (which these racks were not), and that the damage must be of a kind other than "marring and/or scratching," which was the case here, where the barrels split open and emptied their contents onto the ground.

83. In the Denial Letter, Central Mutual only says the Additional Coverage for Collapse of personal property does not apply because "[b]ased on the investigation, it does not appear that the loss was caused by or resulted from any of the causes identified in (a) through (d)," which include "use of defective materials or methods in construction." Central Mutual makes no attempt to reconcile this statement with its own engineer's report that finds "incomplete fusion" of welds, which it specifically states it "considered defective."

84. Moreover, Central Mutual cites no facts from its "investigation" to justify its assertion of the exclusions for "wear and tear" or "corrosion" or attempts to reconcile those positions with the inspection performed by Vale Fox on each of the racks (discussed at length in the EUO) or the April 8 J.S. Held Report, which makes no mention corrosion as a cause of the Loss.

85.     Finally, Central Mutual makes no attempt whatsoever to reconcile its invocation of exclusions for "hidden or latent defect" or "faulty, inadequate or defective workmanship" with the fact that it specifically sold Additional Coverage for Collapse to Vale Fox that, by its terms, applies when there has been "use of defective materials or methods in construction."

86.     While the Denial Letter also asserts the Policy exclusion for loss caused by "collapse," it at least notes that the exclusion does not apply to the Additional Coverage for Collapse, which, as explained above, is implicated here. Moreover, that exclusion, by its terms, does not apply when the collapse is caused by "[w]eight of . . . personal property."

87.     Had Central Mutual complied with its contractual obligations and paid Vale Fox's claim, Vale Fox would not have had to incur various costs stemming from the Loss. These costs include, but are not limited to:

a.     Borrowing from a revolving credit facility to finance the business and ongoing operations, borrowing costs it had not planned to incur had it been able to sell the lost whisky or if Central Mutual had promptly paid the claim;

b.     Loss of momentum in sales attributable to being unable to follow up its successful 2023 sales of Curium single malt whisky with the lost whisky and the necessary lag time to age additional whisky to bring to market;

c.     Limited supplies three to four years in the future due to the knock-on effect of being forced to periodically shut down production of single malt whisky; and

d.     Reducing staff to cope with its reduced cash flow due to a lack of products for sale in 2024.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

88.     Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs, specifically paragraphs 47–56 and 76, as if fully set forth herein.

89.     The Policy constitutes a valid and enforceable contract between Vale Fox and Central Mutual.

90.     Vale Fox has complied with all obligations under the Policy.

91.     As described above, Vale Fox has sustained loss under the terms of the Policy and is thus entitled to coverage.

92.     Under the terms of the Policy, Central Mutual must pay up to $5,652,000 for "direct physical loss of or damage to" "Personal Property of Insured Including 'Stock,'" and up to $1,419,000 for "direct physical loss of or damage to" a Building.

93.     Central Mutual has not paid Vale Fox any amounts in connection with its claim. By failing to provide coverage, Central Mutual has breached the terms of the Policy.

94.     As a direct, proximate, and legal result of Central Mutual's breach of contract, which is continuing as of the date of this Complaint, Vale Fox suffered damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

95.     Vale Fox repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

96.     Pursuant to the Policy, Central Mutual is obligated to pay, up to the limit of liability, for a claim that is covered by the Policy's insuring agreement and is not otherwise excluded from coverage.

97.     As detailed above, the facts of the claim come within the Policy's insuring agreement and coverage is not otherwise excluded.

98.     Central Mutual disputes its legal obligation to pay Vale Fox's claim.

99.     Pursuant to 28 U.S.C. § 2201, Vale Fox is entitled to a declaration by this Court of Central Mutual's obligations under its Policy.

100.     An actionable and justiciable controversy exists between Vale Fox and Central Mutual concerning the proper construction of the Policy and the rights and obligations of the parties thereto, with respect to the claim at issue.

101.     Pursuant to 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of Vale Fox and against Central Mutual, declaring that there is coverage available for Vale Fox's claim under the Policy, and, pursuant to 28 U.S.C. § 2202, any other relief this Court deems proper. Such a declaration would resolve the current controversy between Vale Fox and Central Mutual.

**THIRD CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

102.     Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs, specifically paragraphs 59–60, 66–71, and 77–87, as if fully set forth herein.

103.     Under New York law, the Policy contains an implied covenant of good faith and fair dealing.

104.     Throughout the course of the claim, Vale Fox provided all documents, information, and other cooperation (including attending the EUO and allowing access to its property for multiple inspections by Central Mutual or J.S. Held personnel) reasonably required by Central Mutual.

105.     In response, Central Mutual engaged in conduct that unnecessarily delayed adjustment of Vale Fox's claim, either due to inattention or an intention to delay the claim. It waited weeks or months to request information it could have requested at the outset, attempting to justify that delay by citing unnamed people who were reviewing the file and an undefined process. It waited weeks after both Vale Fox and its engineer requested metallurgical analysis to conduct that analysis. It made no effort to address mistaken facts or apparent contradictions in its engineer's

19

reports. And it scheduled, delayed, and then ultimately conducted an EUO that is not referenced once in its Denial Letter, apparently having played no appreciable role in its claim investigation.

106.    And when Central Mutual did take a coverage position, it took one that is so unreasonable that no other insurer would be expected to take it. The coverage position was a series of conclusory statements, cherry-picking or ignoring facts to take positions that are inconsistent with the language of its own Policy.

107.    Through these actions, Central Mutual has breached the Policy's implied covenant of good faith and fair dealing.

108.    Vale Fox has been damaged by Central Mutual's breaches of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

109.    Vale Fox is entitled to consequential damages flowing from Central Mutual's violations of the implied covenant of good faith and fair dealing, including, without limitation, the attorneys' fees and costs incurred by Vale Fox in enforcing its rights and as a consequence of Central Mutual's bad faith denial of coverage for the claim.

110.    Consequential damages, including payment of attorneys' fees and costs, were reasonably contemplated by Vale Fox and Central Mutual at the time they entered into the Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a.    On the First Cause of Action, Plaintiff requests that the Court enter judgment against Defendant, awarding Plaintiff damages in an amount to be determined at trial, but not less than $75,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

     b.     On the Second Cause of Action, Plaintiff requests that the Court enter a declaratory judgment in favor of Plaintiff against Defendant, declaring that Defendant is required to pay Plaintiff up to the applicable limits of the Policy for the claim;

     c.     On the Third Cause of Action, Plaintiff requests that the Court enter a judgment against Defendant, awarding Plaintiff damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

     d.     Additionally, Plaintiff requests such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 23, 2024

COHEN ZIFFER FRENCHMAN & MCKENNA LLP

Robin L. Cohen
Alexander M. Sugzda
1325 Avenue of the Americas
New York, New York 10019
Tel: (212) 584-1890
Fax: (212) 584-1891
rcohen@cohenziffer.com
asugzda@cohenziffer.com

*Attorneys for Plaintiff The Vale Fox Distillery LLC*