UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THE VALE FOX DISTILLERY LLC,

                                        Plaintiff,                    **OPINION & ORDER**

            - against -                                              No. 24-CV-4169 (CS)

CENTRAL MUTUAL INSURANCE COMPANY,

                                        Defendant.
-------------------------------------------------------------x

<u>Appearances</u>:

Robin L. Cohen
Alexander M. Sugzda
Jay C. Hauser
Cohen Ziffer Frenchman & McKenna LLP
New York, New York
*Counsel for Plaintiff*

Mark T. Whitford, Jr.
Barclay Damon LLP
Rochester, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court is Plaintiff's motion for judgment on the pleadings.  (ECF No. 17.)  For

the following reasons, Plaintiff's motion is GRANTED in part and DENIED in part.

I.      **BACKGROUND**

        A.      **Facts**[1]

        The following facts are undisputed.

---

[1] "[T]he Court on a plaintiff's motion for judgment on the pleadings assumes the truth of
the facts set forth in the [Complaint] that are undenied by Defendant[].  The Court therefore
includes in this section allegations that (1) Defendant[] admit[s]; (2) as to which [it] den[ies]
knowledge or information sufficient to form a belief, at least where there can be no reasonable
controversy over the accuracy of the allegation; and (3) as to which [it] refer[s] the Court to the

Plaintiff Vale Fox operates a distillery located in Poughkeepsie, NY.  (ECF No. 1 ("Compl.") ¶ 28.)  After Plaintiff launched its first product in 2019, Plaintiff next began focusing on American single malt whiskey.  (*Id.* ¶ 29.)  To make this product, Plaintiff distills its whiskey and places it in barrels to age for three to four years.  (*Id.* ¶¶ 30, 36.)  The barrels are stored on metal racks on Plaintiff's property.  (*Id.* ¶ 31.)  Each rack is designed to hold two barrels and to stack on top of one another, up to six racks high.  (*Id.* ¶ 35.)  Plaintiff only stacks its racks up to five racks high, inspects its racks before using or moving them to a new location, and does not use a rack that has deformities.  (*Id.* ¶¶ 32-35.)

On December 19, 2023, Plaintiff's manager arrived at the distillery to find that racks that were holding dozens of barrels of whiskey that had been aging for at least three years in the distilling room had collapsed, causing sixty barrels to fall on top of one another and onto the floor.  (*Id.* ¶¶ 39-40.)  As a result, fifty-two of the barrels broke, and the aging single malt whiskey leaked out.  (*Id.* ¶ 40.)  The interior wall of a storage room had also been damaged from the collapse.  (*Id.* ¶ 41.)  Based upon the price at which Plaintiff sold most bottles of its single

---

referenced document."  *Allstate Ins. Co. v. Vitality Physicians Grp. Practice P.C.*, 537 F. Supp. 3d 533, 540 n.1 (S.D.N.Y. 2021).  This section also includes some allegations the truth of which is plain from underlying documents properly considered on this motion.  *See Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, No. 22-CV-8842, 2023 WL 5971144, at *5 (S.D.N.Y. Sept. 14, 2023) ("On a Rule 12(c) motion, courts may consider all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice.  However, if a pleading is contradicted by a document either attached to that pleading or otherwise made a part thereof, the document controls and the court need not accept as true the allegations of the pleading.") (emphasis in original), *appeal dismissed*, No. 23-7451, 2024 WL 1714598 (2d Cir. Jan. 25, 2024).  Unless otherwise indicated, all case quotations omit internal citations, quotation marks, alterations and footnotes.

malt whiskey, the lost whiskey would have been worth more than $2.5 million had it been bottled and sold.  (*Id.* ¶ 43.)

On December 19, Plaintiff notified Central Mutual Insurance Company ("Central Mutual" or "Defendant") of the loss, as Plaintiff had previously purchased an Industrial Processing insurance policy from Defendant (the "Policy").  (*Id.* ¶¶ 1, 57.)  The Policy states that Defendant "will pay for direct physical loss of or damage to Covered Property at the premises [located at 619 Noxon Rd., Poughkeepsie, New York 12603] . . . caused by or resulting from any Covered Cause of Loss."  (*Id.* ¶¶ 47-48; ECF No. 1-1 ("Ex. A") at 47.)[2]  Covered Property includes "Business Personal Property," which itself includes "Stock."  (Compl. ¶ 49; Ex. A at 47.)  "Stock" is defined as "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping."  (Compl. ¶ 50; Ex. A at 62.)  The Policy provides a $5,652,000 limit in coverage for "Personal Property of Insured Including 'Stock.'"  (Compl. ¶ 47; Ex. A at 29.)

Under the Policy's "Causes of Loss – Special Form," (Ex. A at 75-86), Covered Cause of Loss includes "Additional Coverage – Collapse," (Ex. A at 82-84), which provides, in relevant part, the following:

> The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**
>
> **1.** For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.
> **2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this

---

[2] References to page numbers in the Complaint's exhibits refer to the page numbers generated by the Court's Electronic Case Filing ("ECF") system.

Coverage Form or that contains Covered Property insured under this Coverage
Form, if such collapse is caused by one or more of the following:

. . .

    **d.**  Use of defective material or methods in construction, remodeling or
renovation if the abrupt collapse occurs after the construction,
remodeling or renovation is complete, but only if the collapse is
caused in part by:

        1.  A cause of loss listed in **2.a.** or **2.b.**;

        2.  One or more of the "specified causes of loss";

        3.  Breakage of building glass;

        4.  Weight of people or personal property; or

        5.  Weight of rain that collects on a roof.

. . .

**5.**  If personal property abruptly falls down or caves in and such collapse is **not**
the result of abrupt collapse of a building, we will pay for loss or damage to
Covered Property caused by such collapse of personal property only if:

    **a.**  The collapse of personal property was caused by a cause of loss listed
in **2.a.** through **2.d.**;

    **b.**  The personal property which collapses is inside a building; and

    **c.**  The property which collapses is not of a kind listed in **4.**, regardless of
whether that kind of property is considered to be personal property or
real property.

The coverage stated in this Paragraph **5.** does not apply to personal
property if marring and/or scratching is the only damage to that personal
property caused by the collapse.

(Compl. ¶ 51; Ex. A at 82-83.)[3]

    The Cause of Loss – Special Form also separately includes several exclusions.  (Compl.

¶ 52; Ex. A at 75.)  For example, the Policy provides:

**2.** We will not pay for loss or damage caused by or resulting from any of the
following:
 . . .

    **d. (1)** Wear and tear;

---

[3] Section 4 lists various items, such as antennas, awnings, swimming pools and fences,
(Ex. A at 83), that have no applicability here.

> **(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or
> any quality in property that causes it to damage or destroy itself . . . .

(Compl. ¶ 52; Ex. A at 77-78.)  Finally, the Policy's Building and Personal Property Coverage

Form provides that lost "Stock" is valued at the replacement cost.  (Compl. ¶ 54; Ex. A at 29,

61.)[4]  The Policy's Property Extensions Coverage Endorsement, however, adds the following

provision:

> **f.** Manufacturer's Selling Price (Finished "Stock" Only)
>
> [Central Mutual] will determine the value of finished "stock" you manufacture, in
> the event of loss or damage, at:
>
> > **1)** The selling price, as if no loss or damage occurred;
> > **2)** Less discounts and expenses you otherwise would have had.

(Compl. ¶ 55; Ex. A at 127.)  The endorsement does not define "finished 'stock.'"  (Compl.

¶ 56.)  The Business Income (and Extra Expense) Coverage Form of the Policy defines

"[f]inished stock" as including "whiskey and alcoholic products being aged."  (*Id.* ¶ 56; Ex. A at

71.)

After the incident on December 19, Plaintiff sent Defendant detailed updates on the loss,

including information on the value of the whiskey.  (Compl. ¶ 58.)  As part of its claim

investigation, Defendant hired J.S. Held Engineering Services ("J.S. Held") to assess the cause of

the loss.  (*Id.* ¶ 60.)  On February 2, 2024, based on a visual inspection, J.S. Held issued a report

(the "Initial Report") concluding that the damage to the racking was caused by "age-related

---

[4] The "Replacement Cost" provision appears under Section G of the Building and
Personal Property Coverage Form, titled "Optional Coverages."  (Ex. A at 60-61.)  Section G
provides that the Optional Coverages apply if shown as applicable in the Declarations.  (*Id.* at
60.)  Further, the Replacement Cost provision states that it does not apply to "Stock" unless the
Including "Stock" option is shown in the Declarations.  (*Id.* at 61.)  Although the Court does not
see that "Replacement Cost" is listed as applicable in the Declarations, "Optional Coverages" is
included under the heading for "Declarations" on the Policy's Quick Reference sheet, (*id.* at 46),
and "Including Stock" is included in the Declarations, (*id.* at 29).  In any event, the parties seem
to agree that Replacement Cost is applicable to lost "Stock" that is not "finished 'stock.'"  (*See*
Compl. ¶ 54; ECF No. 1-5 ("Ex. E") at 14.)

degradation," and noting that corrosion appeared to have weakened the racks. (*Id.* ¶¶ 61-62; ECF No. 1-2 ("Ex. B") at 5.) This Initial Report also stated, "It is noted that the above comments are based upon a visual inspection. J.S. Held recommends completing a microscopic examination of the metal components referred to above at a forensic metallurgical laboratory." (Ex. B at 6; *see* Compl. ¶ 62.) On February 7, 2024, J.S. Held issued an addendum to the Initial Report, clarifying that the racking "did not fail as a direct result of the weight of the barrels," but "[t]he weight of the barrels did figure into the applied loads that caused the racks to fail." (Compl. ¶ 63; ECF No. 1-3 ("Ex. C") at 2.) It concluded that the racks appeared to have "failed as a result of long-term, hidden damage to the metal cross frames." (Compl. ¶ 63; Ex. C at 2.) It also again mentioned the possibility of further metallurgical examination. (Ex. C at 2; *see* Compl. ¶ 64.) After the reports were issued, Plaintiff continued to provide Defendant with requested information and documents, (Compl. ¶¶ 68-69), and its representative sat for an examination under oath to assist with Defendant's investigation, (*id.* ¶ 70). On April 8, 2024, J.S. Held issued another report (the "April 8 Report") after conducting visual, stereomicroscopic, and metallographic examinations on five sample damaged racks. (*Id.* ¶ 72; ECF No. 1-4 ("Ex. D") at 1.) In the April 8 Report, J.S. Held determined the racks failed due to "incomplete fusion in the welds between the side supports and the connecting bars," which incomplete welds were "considered defective," and that most of the racks had only one pair of connecting bars, making them weaker than the one that had two pairs of connecting bars. (Compl. ¶¶ 73-74; Ex. D at 3-4.)

Following the April 8 Report, on May 9, 2024, Defendant sent Plaintiff a letter denying coverage on the grounds that the Additional Coverage for Collapse was not implicated and that several exclusions applied. (Compl. ¶¶ 76-77; Ex. E.)

### B.    <u>Procedural History</u>

Plaintiff filed its Complaint on June 3, 2024.  (ECF No. 1.)  On August 2, 2024, Defendant answered.  (ECF No. 7.)  On August 9, 2024, Plaintiff filed a pre-motion letter in anticipation of its motion for judgment on the pleadings.  (ECF No. 11.)  The Court held a pre-motion conference on September 13, 2024, at which it discussed the proposed motion with the parties and set a motion schedule.  (*See* Minute Entry dated Sept. 13, 2024.)  The instant motion followed.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(c) provides that "a party may move for judgment on the pleadings" any time "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c); *see VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013).  "Judgment on the pleadings 'is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings.'" *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 339 (S.D.N.Y. 2008) (quoting *Sellers v. M.C. Floor Crafters Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)), *aff'd*, 355 F. App'x 507 (2d Cir. 2009) (summary order).  Thus, "[t]he motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court."  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, Westlaw (database updated May 20, 2025).

"'In evaluating a Rule 12(c) motion, the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party.'" *In re Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) (quoting

*Madonna v. United States*, 878 F.2d 62, 65 (2d Cir. 1989)).  "When a plaintiff moves for judgment on the pleadings, the question for determination is whether on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law."  *Citibank, N.A.*, 2023 WL 5971144, at *5. "In other words, if a defendant's answer admits, alleges, or fails to deny facts which, taken as true, would entitle a plaintiff to relief on one or more claims supported by the complaint, then the plaintiff's Rule 12(c) motion should be granted."  *Mitsui Rail Cap., LLC v. Detroit Connecting R.R. Co.*, No. 13-CV-13502, 2014 WL 3529214, at *2 (E.D. Mich. July 16, 2014).  "Judgment pursuant to Rule 12(c) can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties" because "initial interpretation of a contract is a question of law for a court."  *VoiceAge*, 926 F. Supp. 2d at 529.  This principle applies to insurance contracts.

## III.    <u>DISCUSSION</u>

An insured bears "the burden of proving that the provisions of a policy provide coverage in the first instance."  *Allstate Ins. Co.*, 537 F. Supp. 3d at 547.  Once an insured does so, the burden shifts to the insurer to show that an exclusion from coverage applies.  *See id.*

### A.    <u>Coverage Under Additional Coverage – Collapse</u>

There are four requirements under the Policy for coverage to exist for a given loss:  (1) direct physical loss or damage (2) to Covered Property (3) at the premises described in the Declarations (4) caused by or resulting from any Covered Cause of Loss.  (*See* ECF No. 18 ("P's Mem.") at 13; Ex. A at 47.)  There is no dispute that the first three requirements are met here, but Defendant argues that Plaintiff cannot meet its burden to show that its loss was covered by the

Policy, due to a failure to meet the fourth requirement – that the loss resulted from a Covered Cause of Loss.  (ECF No. 19 ("D's Opp.") at 8-13.)

Covered Cause of Loss under the Policy includes Additional Coverage – Collapse.  (Ex. A at 82, 84.)  But to be covered by that provision, there are several additional requirements. Relevant here are the requirements in Section 5 of that provision, that:  (1) personal property abruptly falls down or caves in; (2) the collapse was caused by a cause of loss in Sections 2.a. through 2.d.; (3) the personal property that collapses is inside a building; (4) the property that collapses is not of a kind listed in Section 4; and (5) the damage to the personal property is more than marring and/or scratching.  (*See* P's Mem. at 14; Ex. A at 83.)  The parties dispute the second requirement – that the collapse was caused by a loss listed in Sections 2.a. through 2.d.  Plaintiff contends that it has met its burden because by the account of Defendant's own engineer, the collapse of the racks meets Section 2.d., in that it was caused by "[u]se of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by . . . (4) Weight of . . . personal property."  (Ex. A at 82-83; *see* P's Mem. at 15.) It contends that the April 8 Report demonstrates that the defective welds in the construction of the racks caused them to buckle under the weight of the barrels.  I agree.

Defendant argues that the second requirement is not met here for two main reasons:  (1) the coverage for collapse is limited to the abrupt falling down or caving in of a building or part of a building, of which there is no allegation here, (D's Opp. at 11); and (2) the loss did not result from a covered peril, because the collapse was not caused by the use of defective material or methods in construction, (*id.* at 10-11).  I address each argument in turn.

### 1.    Collapse of a Building

Defendant argues that Plaintiff cannot show that the collapse of the racks was caused by a cause of loss in Section 2.d., because "abrupt collapse" as used in the Additional Coverage – Collapse section is defined as "an abrupt falling down or caving in of a building or any part of a building."  (D's Opp. at 11; *see* Ex. A at 82.)  Because here it was the personal property and not the building that abruptly collapsed, Defendant argues there is no coverage.  Plaintiff argues that this interpretation cannot be supported because it would render the coverage provided by Section 5 superfluous.  (ECF No. 20 ("P's Reply") at 4-5.)

"[I]nsurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012).  Courts "may not frustrate the intentions of the parties by altering the contract's terms or by reading into the contract meanings not contemplated by the parties.  Instead, [courts] give the words of the agreement their ordinary and plain meaning." *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992).  An insurance policy "must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms." *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co*., 189 F.3d 208, 215 (2d Cir. 1999).  "Insurance policies are read in light of common speech and the reasonable expectations of a businessperson." *United Nat'l Ins. Co. v. Granoff, Walker & Forlenza, P.C.*, 598 F. Supp. 2d 540, 546 (S.D.N.Y. 2009).  "Unambiguous provisions" in the agreement are interpreted according to their "plain and ordinary meaning." *Lavanant v. Gen. Accident Ins. Co. of Am*., 79 N.Y.2d 623, 629 (1992).  If a provision is ambiguous, however, it is construed against the insurer. *See Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 353 (1978).  A provision is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent

person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 90 (2d Cir. 2010).

Additionally, "[e]very provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it." *Mazzaferro v. RLI Ins. Co.*, 50 F.3d 137, 140 (2d Cir. 1995); *see U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F. Supp. 2d 176, 181 (S.D.N.Y. 2003) (Courts must "avoid construing conflicting provisions and ambiguities within a policy in such a manner as to negate certain coverages, or in ways that render coverage provisions mere surplusage."), *aff'g judgment*, 88 F. App'x 441 (2d Cir. 2004) (summary order). "In construing an insurance policy, the court must not ignore or disregard any provision that can be reconciled with other parts of the policy nor should a court interpret a single provision or sentence in a policy and attach to it a greater significance than is intended by the whole terms of a policy." *Mazzaferro*, 50 F.3d at 140. "Every clause or word is deemed to have some meaning. Like any other contract, effect must be given to all its provisions." *Id.*

Section 1 of "Additional Coverage – Collapse" defines "abrupt collapse" as the "abrupt falling down or caving in of a building or any part of a building." (Ex. A at 82.) Thus, because Section 2.d. uses the term "abrupt collapse," (*id.*), it might appear to refer to collapse of a building. Nevertheless, terms "can take on different meanings in different contexts," *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 93 (2d Cir. 2013), and Plaintiff is correct that applying that interpretation to Section 5 would render Section 5 superfluous.

Section 2 provides that Central Mutual "will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building." (Ex. A at

82.)  Under this provision, if the building abruptly falls down or caves in (*i.e.*, collapses), damage to personal property is covered, because "Covered Property" includes "Business Personal Property," such as the racks, and "Stock," such as the aging whiskey.  (Ex. A at 47.)  Therefore, if one were to accept Defendant's reading of Section 5 as only providing coverage for damaged personal property that results from the building abruptly falling down or caving in, it would merely duplicate Section 2's coverage for damage to personal property.  In other words, this would render Section 5 superfluous and meaningless.  It would also go against the plain meaning of the text of Section 5, which specifically provides coverage to damaged personal property when the building has *not* abruptly collapsed.  (*See* Ex. A at 83 (providing coverage when "personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building") (emphasis in original).)  Thus, such a reading offends two rules of contract interpretation.  *See U.S. Underwriters Ins. Co.*, 256 F. Supp. 2d at 181 (policy should be interpreted to avoid surplusage); *Jakobson Shipyard*, 961 F.2d at 389 (policy should be interpreted according to plain meaning of text).  Indeed, if the "abrupt collapse" referred to in 2.c. and 2.d. had to be the collapse of the building, it would make no sense for Defendant to have incorporated those two sections into Section 5, which explicitly applies when personal property collapses but the building does not.  If Defendant did not want to cover damage from defective construction materials or methods in that situation, it should have limited Section 5 to causes of loss listed in 2.a. and 2.b.

In contrast, Plaintiff's contention that in interpreting Section 2.d. for purposes of Section 5, abrupt collapse refers to the abrupt collapse of the personal property, rather than of the building, is the only one that makes sense.  This interpretation would not render the use of "abrupt collapse" in Section 2.d. meaningless, because "abrupt collapse" in the sense that it is the

abrupt falling down or caving in of a building still has meaning in the context of Section 2 itself, which provides coverage for that very scenario. *See Ali*, 719 F.3d at 93 ("It is a well-established rule of construction that words can take on different meanings in different contexts."). And this interpretation ensures Section 5 still has meaning. Thus, under Plaintiff's interpretation, "no word or clause [is] eliminated as meaningless, or disregarded as inoperative." *Mazzaferro*, 50 F.3d at 140. Plaintiff's interpretation is therefore the only reasonable interpretation as applied to Section 5.

### 2. Construction

Similarly, Defendant also argues that Plaintiff cannot show that the collapse of personal property was caused by the cause of loss set forth in 2.d. because that section requires that the loss be caused by use of defective material or methods in construction, which Defendant contends means construction of a building. (D's Opp. at 10.) Plaintiff again argues that Defendant's interpretation of "construction" is unreasonable and unsupported by the case law, and that "construction" means construction of the collapsed personal property. (P's Reply at 3-4.)

Defendant argues that the canon *noscitur a sociis* supports its interpretation that "construction" means construction of the building, as it is followed by the words "remodeling" and "renovation." (D's Opp. at 10-11.) But canons of construction are only employed where a term is ambiguous. *See Cosmetic Laser, Inc. v. Twin City Fire Ins. Co.*, 554 F. Supp. 3d 389, 401 & n.9 (D. Conn. 2021) (canon of *noscitur a sociis* is only an aid when language is ambiguous), *appeal dismissed by* No. 21-2160, 2022 WL 4111813 (2d Cir. Apr. 13, 2022). Although the parties have different interpretations of "construction" in the Policy, "[c]ontract language is not

made ambiguous simply because the parties to the litigation urge different interpretations." *Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 264 (E.D.N.Y. 2016).

"Construction" as used here is not ambiguous "when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014); *see Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) ("[I]n deciding whether an agreement is ambiguous courts should examine the entire contract . . . .  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.").  Reading the Additional Coverage – Collapse provision as a whole – and particularly reading Section 2.d. in conjunction with Section 5 – "construction" cannot mean only construction of a building.  Such an interpretation would be in conflict with the text of Section 5, which provides coverage for personal property that collapses *not* because of the collapse of a building.  The Court cannot imagine, and Defendant has not suggested, a scenario in which personal property within a building collapses because of a defect in the construction of the building, without at least part of the building itself collapsing.  Such a scenario seems absurd, and absurd results must be avoided in contract interpretation.  *See Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) ("Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."); *In re DPH Holdings Corp.*, 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.").  Rather, in the context in which this provision is to be read, *see Ali*, 719 F.3d at 93 ("[T]he text should always be read in its context."), the only reasonable interpretation is that advanced by Plaintiff:  that the defective

construction must be of the thing that collapsed.  This reading comports with the reasonable expectations of parties who had specifically contracted for coverage for collapse of personal property where a building does not also collapse.

Nevertheless, Defendant contends that a New York Supreme Court decision supports its reading of "construction" in the Additional Coverage – Collapse provision, because in that case the court concluded that the term "construction" was limited to construction work done upon the insured premises itself.  *See Audax Constr. Corp. v. Metro. Transp. Auth.*, No. 28888/99, 2003 WL 24011940, at *2 (N.Y. Sup. Ct. Jan. 7, 2003).  But as Plaintiff points out, this case does not stand for the proposition that construction means construction of or on a building specifically, but rather that the construction cannot have been on nearby, uninsured property.  This narrower reading of *Audax* is supported by another New York state case, in which the court held that Additional Coverage – Collapse covered the damage to the plaintiff's building that had collapsed, even though the construction that had caused the collapse had not been on the building itself, but rather another part of the insured property (the outdoor pool).  *See Colombo v. Merchants Ins. Grp.*, No. 08-36932, 2010 WL 3211131, at *5, *8 (N.Y. Sup. Ct. Aug. 9, 2010). Thus, courts do not read such collapse provisions to mean that the defective methods or materials used must necessarily have been in construction only of a building.  Instead, these cases suggest that the construction must have been on some part of the premises or property that is insured. Here, that would include construction of the racks, which were insured.  This reading of the caselaw is also consistent with the Court's interpretation of the provision based upon its plain meaning and the reasonable expectations of the parties.

Accordingly, as applied to Section 5, "construction" means construction of the collapsed property itself.

There is no dispute here that defective material or methods were used in the construction of the racks, as Defendant's own engineer stated that there was "incomplete fusion" in the racks because of "improper and inadequate manipulation of the welding torch by the welder during fabrication," which is "considered a defect." (*See* Ex. D at 3-4.) There is also no dispute that the weight of personal property (the barrels) contributed to the collapse, based on that same report. (*Id.*) Thus, Plaintiff has established the requirement of Section 5.a.: that the collapse of personal property was caused by a cause of loss listed in 2.a. through 2.d. (here, 2.d.). Because the other requirements in Section 5 are not in dispute, Plaintiff has met its burden of showing that the loss was covered by the Policy under the Additional Coverage – Collapse provision.

### B.    Exclusions

Defendant also argues that even if the loss is covered by the Policy, exclusions apply and thus bar coverage. (D's Opp. at 6-8, 11-13.) Plaintiff argues the exclusions do not apply to the Additional Coverage – Collapse provision, because they are general exclusions that do not apply to specific additional coverage. (P's Mem. at 16-20; P's Reply at 6-8.) Plaintiff also argues that, even if the exclusions generally apply, Defendant cannot meet its burden to show the exclusions preclude coverage here. (P's Mem. at 20-21; P's Reply at 8-9.)

In its letter denying coverage, (Ex. E), Defendant relied upon the following exclusions: wear and tear, (Ex. A at 77, Causes of Loss – Special Form § B.2.d.(1)), corrosion and hidden or latent defect, (*id.* § B.2.d.(2)), collapse, (*id.* at 78-79, § B.2.k.), and defective workmanship, (*id.* at 79, § B.3.c.(2)). In its opposition, however, Defendant focuses on the exclusions for wear and tear and corrosion and hidden or latent defect, because it acknowledges that the exclusions for collapse and defective workmanship are not applicable if Additional Coverage – Collapse provides coverage. (D's Opp. at 11 n.3.) Defendant argues that the remaining exclusions are

applicable and preclude coverage here, as they are distinct from the "use of defective material or methods in construction" coverage provided in Additional Coverage – Collapse.  (D's Opp. at 13.)  Beginning with corrosion and hidden or latent defect, Defendant argues that the exclusion precludes coverage because J.S. Held's Initial Report indicated that the damaged racking had been compromised in part by corrosion.  (D's Opp. at 6.)  Defendant also argues that the exclusion precludes coverage because J.S. Held's April 8 Report identifies incomplete fusion welding as the cause of the damaged racking, which Defendant asserts is a hidden or latent defect.  (*Id.* at 7.)  Finally, Defendant argues that the exclusion for wear and tear precludes coverage because J.S. Held's Initial Report indicated that the collapse was in part caused by age-related degradation.  (*Id.* at 8.)

Where there is a direct conflict between a general exclusion and a provision for additional coverage – for example, a general exclusion for decay but additional coverage for collapse that grants coverage for a loss caused by decay – the specific additional coverage trumps the general exclusion.  *See, e.g.*, *Quality Time, Inc. v. W. Bend Mut. Ins. Co.*, No. 12-CV-1008, 2013 WL 474289, at *13 (D. Kan. Feb. 7, 2013) (finding additional coverage for collapse caused in part by hidden decay trumps general exclusions for collapse and decay); *cf. Tabernacle-The New Testament Church v. State Farm Fire & Cas. Co.*, 616 F. App'x 802, 811 (6th Cir. 2015) (collapse coverage extension providing coverage in event of collapse caused by use of defective material or methods in construction trumped exclusion for faulty, inadequate or defective construction); *Easthampton Congregational Church v. Church Mut. Ins. Co.*, 322 F. Supp. 3d 230, 241-42 (D. Mass. 2018) (general exclusion for loss caused by defective construction and materials used in construction did not apply where additional coverage for collapse allowed recovery for collapse caused by use of defective materials or methods in construction), *aff'd on*

*other grounds*, 916 F.3d 86 (1st Cir. 2019).  But courts also find that general exclusions do not apply to additional coverage for collapse in situations, like this one, where there is a general exclusion and the additional coverage does not address it either way.  *See, e.g.*, *130 Slade Condo. Ass'n, Inc. v. Millers Cap. Ins. Co.*, No. 07-CV-1779, 2008 WL 2331048, at *6 (D. Md. June 2, 2008) (exclusions for damage caused by neglect, wear and tear, corrosion, and hidden or latent defect did not modify or qualify Additional Coverage for Collapse section of policy); *Certain Underwriters at Lloyd's Subscribing to Policy No. WDO-10000 v. KKM Inc.*, 215 S.W.3d 486, 494 (Tex. Ct. App. 2006) ("The provision for 'Additional Coverage' is not subject to the exclusions relied upon by appellants but is rather a separate provision that supplements coverage already subject to the exclusions.  In other words, the 'Additional Coverage' provision supplements the coverage otherwise provided, extending it beyond the carved out exclusions. This is most obvious as coverage relates to 'decay,' but it holds true for the other exclusions as well."); *Stamm Theaters, Inc. v. Hartford Cas. Ins. Co.*, 113 Cal. Rptr. 2d 300, 307 (Ct. App. 2001) (finding wear and tear exclusion did not imply restriction on coverage for collapse caused by hidden decay, and stating, "Obviously, [Defendant's] collapse coverage was not meant to be limited by the generally applicable policy exclusions.").  Further, the Second Circuit has stated that "[e]ven where there is no true conflict between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."  *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 97 n.7 (2d Cir. 2021).  Here, it is clear from the text of the agreement that the parties intended *additional* coverage for collapse, not meaningless coverage canceled out by the general exclusions.

Courts in this Circuit have similarly held that exclusions did not apply to additional coverage provisions by looking to the text of that specific policy. For instance, in *Kowalyshyn v. Excelsior Insurance Co.*, although the policy listed faulty construction as an excluded cause, the court found the additional coverage was "a coverage-restoring exception to Coverage A's exclusions." No. 16-CV-148, 2018 WL 888724, at *6 (D. Conn. Feb. 13, 2018). The court found it significant that the exclusions specifically mentioned that they applied to Coverages A and B but did not mention the additional coverages, regarding that as evidence of the parties' intention that the exclusions would not apply to the additional coverages. *Id.* Similarly, the court in *Sirois v. USAA Casualty Insurance Co.* said the policy was at least ambiguous as to whether the general exclusions applied to the additional collapse coverage because the heading for the section on exclusions read, "LOSSES WE DO NOT COVER UNDER DWELLING PROTECTION AND OTHER STRUCTURES PROTECTION." 2017 WL 3726468, at *5 (D. Conn. Aug. 29, 2017). The court there also found it significant that the heading did not mention the additional coverages. *Id.* Further, the policy had been amended later to specifically incorporate the exclusions into the additional coverage for collapse, which suggested that they had not been so incorporated at the time when the policy was devoid of that language. *Id.* On the other hand, the court also found it was reasonable to interpret the policy's additional coverage provision as incorporating the exclusions because, under "LOSSES WE DO NOT COVER," where "Collapse" was listed, the insurer included the language "other than as provided in ADDITIONAL COVERAGES," which it would not have needed to do if the exclusions did not modify the additional coverages. *Id.*

In my view, respectfully, the latter reasoning does not bear the weight *Sirois* assigns it. As in that case, here Section 2.k., which excludes coverage for collapse, specifically notes that

the exclusion does not apply to the extent coverage is provided under Additional Coverage –
Collapse.  (Ex. A at 79.)  But this really just means that if the requirements of Additional
Coverage – Collapse are not met, then the exclusion for collapse applies.  In other words, this
language indicates that not every collapse is covered, just the ones that meet the requirements of
the Additional Coverage.  Any other collapses are excluded.  *See Easthampton Congregational
Church*, 322 F. Supp. 3d at 236 ("Taken together, the general collapse exclusion and the
Additional Coverage – Collapse coverage part mean that the Policy provides coverage for only
certain kinds of collapse . . . .).  But the provision that the exclusion for collapse does not apply
"[t]o the extent that coverage is provided under the Additional Coverage, Collapse," (Ex. A at
79), does not indicate that the general exclusions apply where there *is* coverage pursuant to
Additional Coverage – Collapse.  This interpretation is confirmed by Section A of the Building
and Personal Property Coverage Form, which states that "[w]e will pay for direct physical loss . .
. caused by or resulting from any Covered Cause of Loss."  (*Id.* at 47.)  The provision titled
Additional Coverage – Collapse provides in Section D.8. that if an insured meets the
requirements of D.1.-D.7. of that provision, then the collapse is a Covered Cause of Loss.  (*Id.* at
84.)  Thus, not only does the Policy not explicitly incorporate the general exclusions into the
Additional Coverage – Collapse provision, it also explicitly states that collapses that meet the
requirements of that additional coverage are included.  Accordingly, the general exclusions
plainly do not apply to Additional Coverage – Collapse.  *See Derbyshire Baptist Church v.
Church Mut. Ins. Co.*, 469 F. Supp. 3d 535, 543 n.10 (E.D. Va. 2020) ("[A]s a result of the
express grant of coverage under the 'Additional Coverage – Collapse' provision, the general
policy exclusions are inapplicable."); *Easthampton Congregational Church*, 322 F. Supp. 3d at
241 (because "Additional Coverage-Collapse" is a "Covered Cause of Loss," where an insured

establishes a collapse, it "has established a 'Covered Cause of Loss' for which [Defendant] is obligated to pay, notwithstanding the provisions of the Policy's general exclusions.").

Further, that the Policy here did not include an anti-concurrent clause with respect to the asserted exclusions supports the conclusion that the general exclusions do not apply to Additional Coverage – Collapse. "[A]n 'anti-concurrent' clause . . . excludes coverage for damage caused by an excluded peril even when covered perils also contribute to the damage." *Alamia v. Nationwide Mut. Fire Ins. Co.*, 495 F. Supp. 2d 362, 368 (S.D.N.Y. 2007); *see ABI Asset Corp. v. Twin City Fire Ins. Co.,* No. 96-CV-2067, 1997 WL 724568, at *2 (S.D.N.Y. Nov. 18, 1997) ("New York courts have interpreted similar clauses to mean that where a loss results from multiple contributing causes, coverage is excluded if the insurer can demonstrate that *any* of the concurrent or contributing causes of loss are excluded by the policy."). Defendant included an anti-concurrent clause in Section B.1. of the Causes of Loss – Special Form, which lists a number of exclusions including earth movement, governmental action, war and military action, and water, to name a few. (*See* Ex. A at 75-77 ("Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.").) The exclusions that Defendant asserts here for corrosion, hidden or latent defect, and wear and tear do not appear in that list. Rather, those exclusions are found in Section B.2., which, unlike Section B.1., does not include an anti-concurrent clause. Thus, the inclusion of the anti-concurrent clause in one section of the Policy, but not here, suggests that the parties intended that the exclusions in Section B.2. would not apply to bar coverage if the loss was at least in part caused by a covered cause of loss. *See Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*, No. 15-CV-14, 2019 WL 2075880, at *2 (D. Conn. Mar. 6, 2019) (acknowledging provision that lacks the anti-concurrent lead-in language contained within another provision is not subject

to same terms as provision with anti-concurrent clause); *Seward Park Hous. Corp. v. Greater N.Y. Mut. Ins. Co.*, 836 N.Y.S.2d 99, 102 (App. Div. 1st Dep't 2007) (had parties intended to require cause to be dominant cause to be covered, contract could have so stated); *Simonetti v. Selective Ins. Co.*, 859 A.2d 694, 699-700 (N.J. Super. Ct. App. Div. 2004) (inclusion of anti-concurrent clause for exclusions in first section but not for exclusions in second section evidenced clear intention to bar coverage for the former, but not the latter).  "If [Defendant] wanted to limit recovery to collapses caused *only* by [defective methods in construction] or to exclude coverage where [wear and tear] contributed to the collapse, it could have done so." *Easthampton Congregational Church*, 322 F. Supp. 3d at 241; *see Fabozzi*, 639 F. App'x at 762 (construing ambiguous language against insurer where it had used an anti-concurrent clause elsewhere in the policy and thus knew "how to make itself plain on these matters" but did not do so in relevant provision).  Because Defendant did not do so here, Defendant cannot meet its burden of showing the exclusions apply where it is undisputed that defective materials or methods in construction of the racks was at least one of the causes of the collapse.

Accordingly, Plaintiff's loss is covered under the Policy, and the general exclusions do not apply to bar coverage.  Plaintiff's motion for judgment on the pleadings as to those issues is granted.

### C.    <u>Valuation of Finished Stock</u>

Plaintiff also seeks a declaratory judgment that Plaintiff's loss should be valued according to the Manufacturer's Selling Price (Finished "Stock" Only) provision (the "MSP provision"), part of the Property Extensions Coverage Endorsement which amends the Building and Personal Property Coverage Form.  (P's Mem. at 22; Compl. ¶ 55.)  The MSP provision, provides:

**f.** Manufacturer's Selling Price (Finished "Stock" Only)

[Central Mutual] will determine the value of finished "stock" you manufacture, in the event of loss or damage, at:

**1)** The selling price, as if no loss or damage occurred;
**2)** Less discounts and expenses you otherwise would have had.

(Compl. ¶ 55; Ex. A at 127.)  "Finished 'stock'" is not defined in the MSP provision or elsewhere in the Policy, and thus Plaintiff argues that the Court should interpret it to have the same definition as "finished stock," which is defined in the Business Income (and Extra Expense) Coverage Form as "whiskey and alcoholic products being aged . . . ."  (Ex. A at 71.)

Defendant, on the other hand, argues that Plaintiff's loss is not "finished 'stock'" as required for the MSP provision to apply, and therefore, Plaintiff's loss should be valued at the replacement cost, as provided in Section G.3. of the Policy's Building and Personal Property Coverage Form.  (*Id.* at 61.)  The Replacement Cost provision provides as follows:

**3. Replacement Cost**

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

**b.** This Optional Coverage does not apply to:

. . .

**(4)** "Stock," unless the Including "Stock" option is shown in the Declarations.

(*Id.* at 61.)  As discussed above, "Stock" is shown in the Declarations, (*id.* at 29), and the parties seem to agree that the Replacement Cost replaces Actual Cash Value for Stock, (Compl. ¶ 54; Ex. E at 14).

As an initial matter, a determination on the issue of the proper interpretation of the valuation provision is not necessarily premature, as Defendant argues, (D's Opp. at 13), because the Court is merely deciding the method to use to calculate Plaintiff's damages, not performing the calculation.  Thus, that there has been no discovery concerning the extent of the damages

does not preclude a determination as to how they should be valued.  Additionally, that there has

been no discovery as to the nature of Plaintiff's damages also does not necessarily preclude such

a determination, because Plaintiff alleged that the barrels contained whiskey that it was "ready to

bottle and sell," (Compl. ¶ 44; *see* P's Mem. at 22), that was "stored on racks in its distilling

room," (Compl. ¶ 39), and had been aging for at least three years, (*id.* ¶¶ 3, 39).  Plaintiff further

alleged that it generally sells whiskey after aging it for at least three years.  (*Id.* ¶ 2).  Defendant

denied knowledge or information sufficient to form a belief as to the truth of each of those

allegations, (*see* ECF No. 7 ¶¶ 2-3, 39, 44), and thus they are considered undisputed for purposes

of this motion, *see Allstate Ins. Co.*, 537 F. Supp. 3d at 540 n.1.  Accordingly, the nature of

Plaintiff's damages is undisputed for purposes of this motion.

 Defendant argues that Plaintiff is not entitled to a declaration that its loss must be valued

by the manufacturer's selling price because to be valued under that provision, the lost whiskey

must be "finished 'stock,'" which Plaintiff's whiskey, given that it was still being aged, is not.

(*See* D's Opp. at 14.)  It contends that while the definition of "finished stock" in the Business

Income (and Extra Expense) Coverage Form includes whiskey still being aged, "finished stock"

and "finished 'stock'" are two different things; that the two terms are contained in different

portions of the Policy that supply two distinct coverages; that therefore the definition for

"finished stock" in the Business Income (and Extra Expense) Coverage Form does not apply here

and because it does not, Plaintiff cannot show that its lost whiskey was "finished 'stock'" to be

valued at the manufacturer's selling price.  (*Id.* at 13-15.)  Plaintiff argues that, because the

Policy does not provide a definition of either "finished" or "finished 'stock,'" the definition for

"finished stock" should apply, which includes whiskey that is being aged.  (P's Reply at 9-10.)

It is unlikely that "finished 'stock'" was meant to include whiskey that was still in the process of being aged, as Plaintiff contends. "Stock" includes both "in-process" and "finished" goods. (Ex. A at 62.) Thus, by using the term "finished 'stock,'" Defendant likely intended to clarify that of the Stock to which it could be referring (in-process whiskey or finished whiskey), it was referring only to the portion that is finished. Although Plaintiff argues it is "appropriate to look to the one place where the Policy does define 'finished stock' and use that definition," (P's Reply at 10), Defendant is correct that "finished stock" and "finished 'stock'" are grammatically distinct, which indicates that "finished 'stock'" cannot have the same definition as "finished stock." *See Broadwall Mgmt. Corp. v. Affiliated FM Ins. Co.*, No. 21-CV-10247, 2022 WL 3030315, at *7 (S.D.N.Y. Aug. 1, 2022) ("[U]nder New York law, the use of similar but different terms in a single contract strongly implies that the terms are to be accorded different meanings."). Further, it is not necessarily appropriate to look to a completely separate provision of a policy (the Business Income (and Extra Expense) coverage exclusions) to define a term elsewhere in the Policy (in the MSP provision), especially where the former does not purport to define that term for all purposes, *see Quality Time, Inc.* 2013 WL 474289, at *10. The definition in the Business Income (and Extra Expense) provision thus does not govern.

There being no other definition in the Policy to which to turn, it is not clear exactly what constitutes "finished" whiskey. Where a policy does not define a term, "it is to be afforded its ordinary meaning . . . and, again, any ambiguity must be resolved in favor of the insured." *Bridge Metal Indus., L.L.C. v. Travelers Indem. Co.*, 812 F. Supp. 2d 527, 535 (S.D.N.Y. 2011), *aff'd sub nom. Bridge Metal Indus., LLC v. Travelers Indem. Co.*, 559 F. App'x 15 (2d Cir. 2014). Courts often turn to dictionaries to determine a word's ordinary meaning. *See Sirois v.*

*USAA Casualty Ins. Co.*, 342 F. Supp. 3d 235, 242 (D. Conn. 2018) (using a dictionary to interpret a term is appropriate).

The Merriam Webster Dictionary provides the following definitions for "finished":  (1) "entirely done," or "brought to a completed state"; (2) "provided with a finish:  having a final treatment or coating on the surface"; (3) "marked by the highest quality."  *Finished*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/finished (last visited Sept. 9, 2025). The first definition is the relevant definition here, but it does not provide clarity, because it is still not clear what it means in this context for aging whiskey to be "entirely done" or "brought to a completed state."  Is whiskey in a completed state when it is done aging?  Is it in a completed state when it has been bottled and is ready to be sold?  Neither the dictionary definition nor the Policy itself answers these questions.

As "Stock" includes "in-process" goods, which Defendant seems to argue includes whiskey being aged, (D's Opp. at 14 (describing whiskey being aged in barrels as in-process finished goods)), then finished goods could reasonably mean whiskey that is no longer in process, or, in other words, done being aged.  Thus, one reasonable interpretation is that "finished" means having completed the aging process.  But another reasonable interpretation is, as Defendant suggests, that "finished 'stock'" means whiskey that was bottled and ready for sale. (D's Opp. at 14.)  One could argue that the whiskey has not been "brought to a completed state" (*i.e.*, finished) until it is bottled and prepared for sale, because another definition of "Stock" is "merchandise held . . . for sale," (Ex. A at 62), and "completed" means "having all necessary parts, elements, or steps."  *Completed*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/completed (last visited Sept. 9, 2025).  Arguably, whiskey that has not yet been bottled does not have all the necessary parts for sale.

26

Because "finished 'stock'" is susceptible to more than one reasonable interpretation, it is considered ambiguous. *See Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 163 (D. Conn. 2014). "[A]mbiguous contracts usually present a question of fact inappropriate for resolution in a judgment on the pleadings." *Jujamcyn Theaters LLC v. Fed. Ins. Co.*, 659 F. Supp. 3d 372, 382 (S.D.N.Y. 2023) (collecting cases); *see Thor Equities, LLC v. Factory Mut. Ins. Co.*, 531 F. Supp. 3d 802, 809 (S.D.N.Y. 2021) ("[B]ecause the Court finds that the [relevant policy provision] is ambiguous, judgment on the pleadings . . . is inappropriate at this stage of the litigation . . . ."); *cf. Mt. Hawley Ins. Co. v. Persaud USA Prop. Holdings LLC*, 748 F. Supp. 3d 223, 229 (S.D.N.Y. 2024) ("If the contract is *un*ambiguous, the Court may award judgment on the pleadings . . . .") (emphasis added). The parties have not indicated whether there is "extrinsic evidence that could help elucidate the parties' intent and meaning of the . . . Policy," but it is possible that there is, and thus, "rendering judgment as a matter of law as to the meaning of the . . . Policy is inappropriate at this juncture." *Jujamcyn Theaters LLC*, 659 F. Supp. 3d at 382; *see Gov't Emps. Ins. Co. v. Saco*, No. 12-CV-5633, 2015 WL 1527611, at *5 (E.D.N.Y. Mar. 31, 2015) ("Under New York law, where a contract is genuinely ambiguous, judgment on the pleadings is inappropriate, and extrinsic evidence of the parties' intent should be considered."). Although the Court may be able to resolve the question at the summary judgment stage, I cannot do so at this time. *See Gov't Emps. Ins. Co.*, 2015 WL 1527611, at *5.

Accordingly, Plaintiff's motion for judgment on the pleadings as to whether the loss should be valued according to the MSP provision is denied.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED in part and DENIED in part. The Clerk is respectfully directed to terminate the

pending motion, (ECF No. 17).  The parties shall appear for a case management conference on

October 6, 2025 at 2:15 p.m. in Courtroom 621.

**SO ORDERED.**

Dated:  September 9, 2025
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.